# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DOUGLAS CANAS and VANESSA MESCHINO, on behalf of themselves and all other plaintiffs similarly situated, | ) ) ) ) | Case No.: 1:20-cv-04937 |
| Plaintiffs, | ) ) ) | Hon. Judge John Robert Blakey |
| v. | ) ) | Mag. Judge Sunil R. Harjani |
| SMITHFIELD PACKAGED MEATS CORP., SMITHFIELD FRESH MEATS CORP., AND KANSAS CITY SAUSAGE COMPANY, LLC. | ) ) ) ) ) |  |
| Defendants. | ) |  |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT, ATTORNEYS' FEES, COSTS,
<u>AND INCENTIVE AWARD</u>**

## I.     <u>INTRODUCTION</u>

Plaintiffs seek final approval of a $7,750,000 Class Action Settlement that resolves claims they brought under the Fair Labor Standard Act (FLSA) and Illinois Minimum Wage Law (IMWL) and which arose out of our nation's labor shortage during those first months of the COVID-19 Pandemic when production workers were often unwilling to work. Notice was sent to over 30,000 putative Collective[1] and Class Members[2]. Not a single person objected to the Class Action Settlement and no one filed an election to opt out of it. (See Declaration of Administrator, attached as Exhibit 1, ¶12-13).

---

[1] Referred to in the Settlement Agreement as "FLSA Class Members"
[2] Referred to in the Settlement Agreement as "Illinois Class Members"

Smithfield Packaged Meats Corp., Smithfield Fresh Meats Corp., and Kansas City Sausage Company, LLC (collectively, "Smithfield") are one of the nations' largest pork producers. Smithfield wanted to increase its employees' compensation during the COVID-19 Pandemic. To do this, Smithfield paid its employees a $500 payment in May 2020 and additional compensation referred to in Smithfield's payroll records as "Responsibility Pay" for several months thereafter (collectively this compensation is referred to as the "Responsibility Bonus").

Plaintiffs' lawsuit alleges that the Responsibility Bonus should have been factored into its employees' overtime rates. Smithfield disagreed. Rather than fighting over these issues for many years during prolonged litigation, the Parties reached a resolution during a settlement conference that was held with Magistrate Judge Sunil R. Harjani on February 2, 2021.

On March 25, 2021, the Court preliminarily approved the settlement and found it was "fair, reasonable and adequate and in the best interest" of the putative classes that were certified for settlement. [Doc. #44] For the reasons stated below, Plaintiffs requests that the Court grant final approval of the Parties' Settlement Agreement attached as Exhibit 2 and enter the proposed order attached as Exhibit 3.

## II. LEGAL BACKGROUND AND PROCEDURAL HISTORY

As described in greater detail in the Amended Complaint and Plaintiffs' Unopposed Motion for Preliminary Approval, Plaintiffs' overtime wage claims are based on additional "Responsibility Bonus" compensation that they allege were not captured when calculating the regular rate and, thus, the overtime rate of pay for several months in 2020.

Smithfield denied Plaintiffs' allegations and, to the contrary, contends that the additional compensation were gifts and/or discretionary bonuses to recognize employees for working and overcoming difficult circumstances--and therefore did not qualify as compensation that factored

2

into the overtime rate. Smithfield pointed out that it paid its Responsibility Bonus to thousands of workers who performed no work at all and therefore it was more akin to a discretionary payment or a gift. It also argued that, after examining Smithfield's Responsibility Bonus in one of its plants, a United States Department of Labor investigator opined that the bonus did not need to be included in the overtime rate.[3]

While Plaintiffs were confident in their claims, there was some uncertainty because an adverse ruling on these or other issues could result in Plaintiffs receiving no damages whatsoever. *See* 29 U.S.C. § 207(e)(1) and 29 U.S.C. § 207(e)(3). And, with a DOL investigator's opinion supporting their position, along with the unchartered waters of operating in an unprecedented Pandemic, Smithfield would likely argue that it acted in good faith pursuant to 29 U.S.C. § 259. Smithfield also would likely argue against certification because this case involved dozens of different plants, different Smithfield entities, different pay structures, and both union and non-union employees.

Starting in Fall 2020, the parties began settlement discussions that continued for several months. During these negotiations they exchanged payroll records to ascertain class and collective size and damages. All damage calculations were derived from Defendants' payroll data. Through further negotiations, aided by a successful settlement conference held by the Honorable Sunil R. Harjani, the parties reached a proposed class and collective settlement. A copy of the Settlement Agreement is attached as Exhibit 2. On March 25, 2021 this Court granted preliminary approval

---

[3] The USDOL investigator found: "The firm paid a temporary bonus that was considered to be discretionary. . . . the bonus was not measured by or dependent upon hours worked and was provided during the challenging and stressful situation created by the pandemic. In addition, it was noted in the payroll records that employees received the bonus even when they reported no hours worked in a pay period." The redacted USDOL records are attached as Exhibit 4.

of the Parties' Settlement Agreement.

The Notice Program in this case was particularly effective because all Class Members worked for Smithfield. As an employer, Smithfield maintains employee address data. And, unlike most cases where the alleged actionable conduct occurred many years before a settlement is reached, the employees here all worked for Smithfield during 2020. As such, there is a high level of confidence that the overwhelming majority of Class Members received notice through first class mail.

## III. SUMMARY OF SETTLEMENT TERMS.

### A. FLSA Collective and Illinois Class Members

The settlement gives Collective and Class Members gross settlement awards that are over 100% of their alleged unpaid overtime. The calculated overtime damages for Collective and Class Members amounted to only $7,600,920. Therefore, the Gross Settlement Fund of $7,750,000 represents approximately 102% gross recovery.

Illinois Class Members were also eligible to become FLSA Collective members by submitting claim forms, and those that did will receive an award as both an FLSA Collective Member and Illinois Class Member. Those Illinois Class Members who did not submit executed claim forms still remain Illinois Class Members and will receive their Illinois Class Member settlement award. Additionally, a floor was created so the minimum gross amount any FLSA Collective or Illinois Class Member will receive is $38.70, this will result in many members receiving more than their calculated unpaid overtime[4]. The average settlement amount for

---

[4] Moreover, the Settlement Agreement terms guaranteed that at least 60% of the Net Settlement Fund will be paid out. The Net Settlement Fund is the Gross Settlement Fund ($7,750,000) minus one-third for proposed attorney fees, costs,

Collective and Class Members is approximately $289.61. See Ex.1, ¶15.

Those potential FLSA Collective Members who did not timely submit executed claim forms are not FLSA Collective Members and will not receive settlement awards. Since they are not Collective Members, they will not be releasing Defendants from any FLSA claims or causes of action. No Illinois Class Member has omitted themselves from this Settlement. Any Illinois Class Members that submitted executed claim forms are also considered FLSA Collective Members, and those who did not submit claim forms remain Illinois Class Members but have not become FLSA Collective Members.

The Settlement Award check for each FLSA Collective Member (including those Illinois Class Members who filed claim forms) shall contain on the back of each check the following language: "I agree to all terms of the Settlement Agreement and Release in Canas, et al. v. Smithfield Packaged Meats Corp., et al., and waive any right to bring suit for wages under state or federal law as stated therein." The Settlement Award checks for those members who are only part of the Illinois Class shall contain the following language: "I agree to all terms of the Settlement Agreement and Release in Canas, et al. v. Smithfield Packaged Meats Corp., et al., and waive any right to bring suit for wages under Illinois law as stated therein."

---

the proposed service awards, taxes, estimated claims administrator fees, and reserve fund. The Net Settlement Fund (NSF) is $4,925,008.84 See Ex.1,¶15. $1,565,785.93 was claimed by joining FLSA Collective Members and $376,990.44 is allocated as the Illinois Class Member Awards. Id. This combines to make $1,942,776.37. *Id.* However, recognizing that current employees are often reluctant to join into a lawsuit against a current employer, the Plaintiffs negotiated a floor to assure that a sufficient percentage of the funds would be paid out. The Settlement Agreement guaranteed that at least 60% of the Net Settlement Fund (or $2,955,005.30) be paid. This means that the additional allocation was triggered and the difference between those sums ($1,012,228.94 = $2,955,005.30-$1,942,776.37) will be reallocated to FLSA Collective Members. To provide an illustrative example, Employee # 456880 is an FLSA Collective Member estimated to receive $652.68 but will actually receive an additional $423.44 because of the FLSA allocation for a total gross Settlement Award of $1078.44 after the reallocation. In other words, for every $1 claimed by FLSA Collective Members, they will receive approximately an additional $.65 from the reallocation under the Settlement Agreement.

### B.  Additional Terms.

Within 15 days of the Settlement Effective Date (when the final approval order becomes unappealable), the Settlement Administrator shall issue checks for each FLSA Collective and Illinois Class Members. They shall have 180 days after mailing to cash their checks.

Portions of the FLSA Collective and Illinois Class Settlement Awards attributed to wages shall be treated as W-2 wages and have applicable withholdings applied. Non-wage portions of awards and portions treated as statutory, liquidated damages shall be treated as non-wage 1099 income and will not have withholdings applied.

The Agreement created a Reserve Fund of $20,000 for any errors, omissions or disputes. Any unused portion of the Reserve Fund and the funds from any uncashed checks will be donated as a cy *pres* to Feeding America's Covid-19 Response Fund[5] which seems particularly appropriate because the Defendant provides food in America and many people are struggling as a result of losing jobs during COVID-19.

### C.    Notice Obligations were fulfilled.

Pursuant to the Preliminary Approval Order, the parties carried out their obligations. The Settlement Administrator timely mailed to each FLSA Collective and Illinois Class Member the appropriate notice via first class U.S. mail. Additionally, the Administrator updated addresses after consulting the National Change of Address Databases, remailed notices to forwarding addresses, performed skip traces on undeliverable notices to locate valid addresses, and remailed notices to those discovered through these advanced address searches. Ex. 1, ¶¶ 7-10.    Further, the

---

[5] Feeding America is the nation's largest domestic hunger-relief organization with a network of 200 member food banks across the country. https://www.feedingamerica.org/about-us/press-room/feeding-america-establishes-covid-19-response-fund-help-food-banks-during

Administrator created a website for Members to visit to get more information about the settlement and for potential FLSA Collective Members to submit claims electronically. Ex. 1, ¶11. To maximize participation, the Administrator collected claim forms submitted via mail, email, fax, or electronically through the website. Ex. 1, ¶14. Moreover, the Administrator sent follow-up letters to those who submitted deficient claim forms and they were given an opportunity to cure. *Id.*

## IV.    THE COURT SHOULD GRANT FINAL APPROVAL.

### A.    Class Action Settlement Approval Process

Approval of class action settlements is typically a three-step process:

>    (1) preliminary approval of the settlement at an informal hearing;

>    (2) dissemination of mailed and/or published notice of the settlement to all affected class members; and

>    (3) a "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy and reasonableness of the settlement may be presented.

>    *Manual for Complex Lit.*, at § 21.632–34.

This procedure, used by courts in this Circuit and endorsed by the leading class action treatise, safeguards the due process rights of absent class members and enables the district court to fulfill its role as the guardian of class interests. *See* 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, at § 11.22, *et seq.* At the formal fairness hearing, Class Members may be heard and further evidence and argument concerning the fairness, adequacy, and reasonableness of the Settlement may be presented. With this motion, the Parties request that the Court take the last step in the settlement approval process by granting final approval of the Settlement.

**B.      The Parties Have Satisfied the Requirements of Rule 23 and the Court's Notice Procedures Set Forth in the Preliminary Approval Order.**

As to the distribution of notice, in the Preliminary Approval Order, the Court ordered that notice be effectuated as called for in the Agreement, specifically by first-class mail. Rule 23(c)(2)(B) requires the Court to direct the "best notice practicable" under the circumstances, including "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). As the Supreme Court has held, notice by mail provides such "individual notice to all members" in accordance with Rule 23(c)(2). *Id.* Where the names and addresses of class members are easily ascertainable, individual notice through the mail is "clearly the 'best notice practicable.'" *Id.* at 175.

The Claims Administrator, in fact, mailed to each FLSA Collective and Class Member the appropriate Collective or Class Notice via first class U.S. mail, postage pre-paid, to each Member's last-known physical address, as reflected in Defendant's records and updated with the National Change of Address Database. See Ex 1, ¶7-8.   8,919 FLSA Collective Members submitted executed Claim Forms, no Illinois Class Members have opted out, and nobody has objected. *See* Ex. 1, ¶12-13. Additionally, the notice and other documents were posted on a website, www.canaswageandhouraction.com,  created by the Claims Administrator and this web address was listed on the notice. See Ex. 1, ¶11.  Claims Administrator also created a toll-free telephone number for Collective and Class Members to call with inquires. Ex. 1, ¶4.  FLSA Collective Members could also submit claim forms on this website, or via mail, fax, or email.  The Parties' efforts to effectuate notice to the Class meet the requirements of Rule 23(c)(2)(B).

**C.      Final Approval is Appropriate Pursuant to Rule 23(E) Because the Settlement is Fair, Adequate, and Reasonable**

Ultimately, "the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002) (internal citation omitted). Utilizing a five-factor test, a court must consider: (1) the strength of plaintiffs' case compared with the terms of the proposed settlement; (2) the likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006); *Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996). Further, a court must not focus on an individual component of the compromise, but must instead view the settlement in its entirety. *Isby,* 75 F.3d at 1199. Finally, a strong presumption of fairness exists when the settlement is the result of extensive arm's-length negotiations. *Hispanics United of DuPage County v. Village of Addison, Ill.,* 988 F. Supp. 1130, 1149 n.6 (N.D. Ill. 1997); *Great Neck Capital Appreciation Inv. P'Ship, L.P. v. Pricewaterhouse Coopers*, 212 F.R.D. 400, 410 (E.D. Wis. 2002). For the following reasons, the class action settlement is fair, adequate, and reasonable, and not a product of collusion and therefore should be finally approved.

### 1. Strength of Plaintiffs' Case as Compared to the Amount of the Settlement and Allocation of the Settlement Payment

A key consideration in evaluating a proposed settlement is the strength of the plaintiffs' case as compared to the amount of the defendants' offer. *See Isby*, 75 F.3d at 1199. However, "district courts have been admonished 'to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights.'" *EEOC v. Hiram Walker & Sons, Inc*., 768 F.2d 884, 889 (7th Cir. 1985). A settlement is fair "if it gives [plaintiffs] the expected value of their claim if it went to trial, net of the costs of trial." *Mars Steel Corp. v.*

9

*Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 682 (7th Cir. 1987) (finding adequate a settlement of ten percent of the total sought due to risks and costs of trial); *Hiram Walker,* 768 F.2d at 891 (settlement approved because "there [was] no showing that the amounts received by the beneficiaries were totally inadequate").

Plaintiffs believe that this case is an excellent result for both Collective and Illinois Class Members because both are, (before accounting for attorney fees and costs, etc.), getting at least a gross award of approximately 102% of their alleged unpaid overtime. In the case of FLSA Collective Members, they are receiving even more because they are also getting a share of nearly $1.01 million proportionate to their award as the additional allocation was triggered. Because of this reallocation, FLSA Collective Members are now receiving gross awards increased by approximately 65%. Moreover, all Illinois Class Members were also eligible to file claims and also become FLSA Collective Members to receive an additional award. Additionally, the creation of the gross $38.70 floor means that many Members will receive gross amounts of more than their unpaid overtime.

Settlement eliminates the risk that Collective and Class members could recover a lower amount or nothing at all. While the Plaintiffs felt confident in their claims, there remains the prospect that Plaintiffs might not prevail (or, if they prevail, the recovery might be limited to only a lesser amount of damages than was hoped). Moreover, Defendants could have asserted defenses that may have eliminated or lessened the claims. In particular, Plaintiffs also faced the risk of not being able to certify a class or having a collective decertified as certain issues arose, *i.e*., whether the additional compensation was excludable from regular rate calculations, whether employees are similarly situated, along with the plethora of other defenses that competent defense lawyers (such as those in this case) frequently raise. Defendants may have also attempted to raise novel issues

10

that are new to the law because these payments came as a result of circumstances created by the COVID-19 pandemic.

### 2. Complexity, Length, and Expense of Further Litigation

A second factor to be considered by the Court is the complexity, length, and expense of litigation that will be spared by the proposed settlement. *In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000). Absent settlement, Defendants would continue to vigorously defend the case. Significant attorneys' fees and costs would be expended by all Parties in investigating the claims further and litigating over class certification. Further litigation would potentially result in dispositive motions, and the possibility of appeals. Additional litigation would increase expenses and would not reduce the risks of litigation to the Settlement Class. *See Isby*, 75 F.3d at 1199; *see also In re Mexico Money Transfer Litig*., 164 F. Supp. 2d at 1019; *see also Great Neck Capital,* 212 F.R.D. at 409-10. Accordingly, the remaining burden, expenses, and risks for the Collective and Class Members would be substantial as continued litigation would require resolution of complex issues at considerable expense. "Courts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Beckman v. KeyBank, N.A.,* 293 F.R.D. 467, 474–75 (S.D.N.Y. 2013). This is especially pertinent as this Settlement would put money in the hands of working-class families during the ongoing Covid-19 pandemic without delay, when they likely need it the most.

### 3. There is No Opposition to the Settlement

The Plaintiffs support the settlement, as do Class Counsel and Defendants. Moreover, Class Counsel is not aware of any opposition to the settlement. Class Counsel has not spoken to any Collective or Class Member opposed to settling their claims and receiving payments. The lack of

opposition to a class action settlement "indicates that the Collective and Class Members consider the settlement to be in their best interest." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *6. The Court-approved Claims Administrator diligently implemented the Notice Plan, and the objection and exclusion deadlines have passed without a single person objecting to the Settlement. That no one objected to the Settlement is powerful evidence of the Class's support for the Settlement. *See McDaniel v. Qwest Commc'ns Corp.*, No. CV 05 C 1008, 2011 WL 13257336, at *4 (N.D. Ill. Aug. 29, 2011) (finally approving settlement with no objections and noting that "[a]n absence of objection is a 'rare phenomenon[]' and 'indicates the appropriateness of the request[]'") (citations omitted); *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (stating that "[t]he absence of objection to a proposed class settlement is evidence that the settlement is fair, reasonable and adequate"). Additionally, no Rule 23 Illinois Class Member even opted-out of the settlement. This factor thus strongly supports granting final approval to the Settlement.

### 4. Opinion of Counsel

Class Counsel is experienced in class action litigation and had a substantial amount of information to evaluate, negotiate and make well-informed judgments about the adequacy of the Settlement. In Class Counsel's opinion, the Settlement is fair, reasonable and adequate. See Declaration of David Fish attached as Exhibit 5, ¶7-8.  It is appropriate for the Court to place significant weight on the endorsement of this Settlement by Class Counsel. Class Counsel exercised their experience based on an intimate knowledge of the facts of the case and the legal issues facing the Class, including conducting an independent analysis of the strengths and weaknesses of the claims and value of the claims and the time costs, as well as the expense of trials and appeals. When experienced counsel supports the settlement, as they do here, their opinions are

entitled to considerable weight. *See In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d at 1020; *Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983). "[J]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148-49 (8th Cir.1999) (citation omitted); *Grove v. Principal Mutual Life Ins. Co.*, 200 F.R.D. 434, 445 (S.D. Iowa 2001).

The Fish Law Firm P.C. (effective September 1, 2021, Fish Potter Bolaños, P.C) has been Class Counsel for numerous class wage settlements and other types of class actions. See Doc # 37-6: Firm Overview. Courts in this District have found that the Fish Law Firm are qualified class counsel. *See Pietrzycki v. Heights Tower Serv., Inc.*, 197 F. Supp. 3d 1007, 1019 (N.D. Ill. 2016) (appointing David Fish class counsel after noting his "litigation experience in labor/employment cases as well as class actions[,]" as well as his and his firm's diligence). Furthermore, the Fish Law Firm has and is serving as counsel in many completed and pending wage class action cases and therefore has extensive experience in these fields. Put simply, and for the reasons discussed in detail above, Class Counsel believe that the Settlement provides outstanding monetary and prospective relief without the uncertainty and delay those years of litigation would bring. That certainly is in the best interests of the Settlement Class.

### 5. The Settlement Was the Result of Arm's Length Negotiations Without Any Hint of Collusion

The Settlement was the result of adversarial, arm's length negotiations over several months. This involved negotiating potential damages from payroll data produced by Defendant. Moreover, this Settlement was only obtained with the assistance of a lengthy settlement conference with the Honorable Sunil R. Harjani. See Doc.#32. In determining whether a settlement was reached absent any collusion between the parties, courts look to whether the settlement negotiation

is "intense, vigorous, and at arm's length." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020. Such arm's-length negotiations conducted by competent counsel constitute *prima facie* evidence of a fair settlement. *Berenson v. Fanueil Hall Marketplace*, 671 F. Supp. 819, 822 (D. Mass. 1987) ("where . . . a proposed class settlement has been reached after meaningful discovery, after arm's-length negotiation by capable counsel, it is presumptively fair."). In the absence of any evidence of collusion, this factor favors final approval of the settlement. *See Winston v. Speybroeck*, No. 3:94-CV-150AS, 1996 U.S. Dist. LEXIS 12131, at *15-16 (N.D. Ind. Aug. 2, 1996). The Court should therefore find that the Settlement meets the requirements of and was the result of arm's-length bargaining.

## V. THE COURT SHOULD APPROVE THE ATTORNEY FEES AND COSTS, SERVICE AWARDS, AND CLAIMS ADMINISTRATOR FEES.

### A. The Court Should Approve One-Third Of Gross Settlement Fund As Attorney Fees

#### 1. Class Counsel Negotiated a Settlement Structure that Favors FLSA Collective and Rule 23 Class Members

To begin, the Gross Settlement Fund of $7,750,000 is more than the calculated alleged unpaid overtime of FLSA Collective and Illinois Class Members. The overtime damages amounted to $7,600,920, so the Gross Settlement Fund represents approximately 102% gross recovery before accounting for attorney fees and costs, settlement administrator fees, service award, a reserve fund, and taxes. Moreover, the creation of a gross $38.70 floor means many Members are getting more than what they were allegedly owed. This is an excellent result for FLSA Collective and Illinois Class Members.

#### 2. The Court Should Award Attorney's Fees as a Percentage of the Fund

The Court should award attorney's fees as a percentage of the settlement fund made available to the FLSA Collective and Illinois Class Members. When counsel's efforts result in the

14

creation of a common fund, counsel is "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548 (7th Cir. 2003) (creation of common fund "entitles [counsel] to a share of that benefit as a fee"). This is "based on the equitable notion that those who have benefited from litigation should share in its costs.*" Sutton v. Bernard,* 504 F.3d 688, 691-92 (7th Cir. 2007) (quoting *Skelton v. G.M. Corp.,* 860 F.2d 250, 252 (7th Cir. 1988)); *Kaplan v. Houlihan Smith & Co.*, No. 12 Civ. 5134, 2014 WL 2808801, at *3 (N.D. Ill. June 20, 2014); *see also Boeing,* 444 U.S. at 478.

Although there are two ways to compensate attorneys for successful prosecution of statutory claims – the lodestar method and the percentage of the fund method, *see Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 565-66 (7th Cir. 1994) – the favored approach in the Seventh Circuit is to use the percentage of the fund method in common fund cases like this one. "Our court of appeals favors the percentage-of-the-fund fee in common fund cases because it provides the best hope of estimating what a willing seller and a willing buyer seeking the largest recovery in the shortest time would have agreed to ex ante." *In re FedEx Ground Package System, Inc. Employment Practices Litig.,* 251 F. Supp. 3d 1225, 1236 (N.D. Ind. 2017) (citing *In re Synthroid Mktg. Litig.,* 325 F.3d 974, 979-80 (7th Cir. 2003)); *see also McDaniel v. Qwest Commc'ns Corp.*, No. 05 C 1008, 2011 WL 13257336, at *3 (N.D. Ill. Aug. 29, 2011) ("Many courts have found the percentage-of-recovery method provides a good emulation of the real-world market value of attorneys' services provided on a contingent basis."). It is especially appropriate to use a common fund approach in cases based on fee shifting statutes when the "settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees . . . ." *Skelton,* 860 F.2d at 256; accord *Florin,* 34 F.3d at 564. Here, the Settlement

releases Collective and Class Members' statutory claims to fees. There are several other reasons that courts in the Seventh Circuit favor the percentage of the fund method. First, the percentage of the fund method promotes early resolution and removes the incentive for plaintiffs' lawyers to engage in wasteful churning of the file to increase their billable hours. *See In re Synthroid Mktg. Litig.,* 264 F.3d 712, 789-90 (7th Cir. 2001). Where attorneys' fees are limited to a percentage of the total, "courts can expect attorneys to make cost efficient decisions about whether certain expenses are worth the win." *Gaskill v. Gordon,* 942 F. Supp. 382, 386 (N.D. Ill. 1996), aff'd, 160 F.3d 361 (7th Cir. 1998); *see also In re Amino Acid Lysine Antitrust Litig.*, No. 95 Civ. 7679, 1996 WL 197671, at *2 (N.D. Ill. Apr. 22, 1996) (explaining "growing recognition that in a common fund situation . . . a fee based on a percentage of recovery . . . tends to strike the best balance in favor of the clients' interests while at the same time preserving the lawyers' self-interest").

Courts in the Northern District of Illinois routinely approve one-third of the settlement fund as attorneys' fees in FLSA collective actions settlements. *See, e.g., Castillo v. Noodles & Co.*, 2016 WL 7451626 (N.D. Ill. Dec. 23, 2016), at *3-4 (awarding one-third of a $3,000,000 settlement fund in FLSA overtime action); *Furman v. At Home Stores LLC*, No. 2017 WL 1730995, at 3-4 (N.D. Ill. May 1, 2017) (awarding one-third of $990,000 settlement fund in FLSA overtime action); *Briggs v. PNC Financial Services Group, Inc.*, 2016 WL 7018566, at *1 (N.D. Ill. Nov. 29, 2016)  (awarding one-third of $2,000,000 settlement fund in FLSA overtime action); *Day v. NuCO2 Mgmt., LLC*, 1:18-CV-02088, 2018 WL 2473472, at *1 (N.D. Ill. May 18, 2018) (awarding one-third of $900,000 settlement fund in case that was settled before filing suit); *Koszyk*, 2016 WL 5109196, at *3-4 (awarding one-third of $2,825,000 settlement fund in FLSA overtime case). Consistent with the Seventh Circuit's admonition to award attorneys' fees that approximate the market rate, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), these courts explain

that one-third of the settlement fund is consistent with market rates in the Northern District of Illinois charged by experienced plaintiffs' counsel in contingent-fee wage and hour class and collective actions.

Second, the percentage method preserves judicial resources because it saves the Court from the cumbersome task of reviewing complicated and lengthy billing documents. *Florin,* 34 F.3d at 566 (noting "advantages" of percentage of the fund method's "relative simplicity of administration"); *Gaskill*, 942 F. Supp. at 386 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (fee requests "should not result in a second major litigation")). Courts in this district routinely apply the percentage method to common fund settlements and have noted the advantages of this approach. *See, e.g.*, *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig*., 792 F. Supp. 2d 1028, 1040 (N.D. Ill. 2011) (using percentage method because it did "not need to resort to a lodestar calculation, which would be costly to conduct, to reinforce the same conclusion"); *Gaskill*, 942 F. Supp. at 386 (describing advantages of percentage method, including judicial efficiency and an "efficient check on the attorney's judgment" in economic decision-making). As the Second Circuit has explained, the "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 48-49 (2d Cir. 2000) (citation omitted)

### 3.  The Market for Legal Services Supports Plaintiffs' Request.

In deciding the fee to award in common fund cases, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton,* 504 F.3d at 692-94, citing *In re Synthroid Mktg. Litig.,* 264 F.3d at 718 (collecting cases)). The

Seventh Circuit has held that "[a]lthough it is impossible to know ex post exactly what terms would have resulted from arm's-length bargaining ex ante, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. Aon Corp.,* 415 F.3d 597, 599 (7th Cir. 2005). The percentage method is consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *Kirchoff v. Flynn,* 786 F.2d 320, 324 (7th Cir. 1986) ("[w]hen the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'") (emphasis in original). In the marketplace, the "contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Kirchoff,* 786 F.2d at 325; see also *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998).

Here, prior to filing the Complaint, Class Counsel executed a fee agreement with the Class Representatives that entitled Class Counsel to attorney's fees equal to 40% of any recovery (Ex. 5, ¶9) but Class Counsel has elected to only seek one-third. Because the Parties negotiated an attorneys' fees arrangement at the start of the litigation, the presumption of market-rate reasonableness applies. See *Briggs v. PNC Financial Services Group, Inc.,* No. 1:15-cv-10447, 2016 WL 7018566, at *4 (N.D. Ill. Nov. 29, 2016). Class Counsel is seeking one-third of the common fund plus $2,000 in litigation costs and the Class Representative's requested service awards of $7,500 each. This percentage is consistent with the low end of standard contingent fee awards in the Northern District of Illinois. See *Dobbs v. DePuy Orthopaedics, Inc*., 885 F.3d 455, 459 (7th Cir. 2018) ("The typical contingent fee is between 33 and 40 percent") citing *Gaskill v. Gordan*, 160 F.3d at 361, 362 (7th Cir. 1998); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,

No. 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (customary contingency fee ranges from 33 1/3% to 40% of the amount recovered); *Prena v. BMO Fin. Corp.,* No. 15 C 09175, 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015) (contingency of 33-40% is typically charged in FLSA cases*); In re Diary Famers of Am., Inc*., 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) (the usual range of contingent fees is between 33 and 50 percent); *McDaniel,* 2011 WL 13257336, at *4 ("[T]he real-word market range for contingent fee cases is 33% to 40%.").

### 4. The Risk of Non-Payment Supports the Requested Attorney's Fee Award

Counsel's decision to seek the market rate is also reasonable in light of the significant risks of nonpayment that Class Counsel faced particularly because the Department of Labor investigator disagreed with their assessment of legal implication of the payments at issue in this case. At the outset of the litigation, Class Counsel took "on a significant degree of risk of nonpayment" in agreeing to represent Class Representatives. *Taubenfeld,* 415 F.3d at 600 (approving of district court's reliance on this factor in evaluating attorneys' fees). Class Counsel took this case on a contingent fee basis and assumed the risk that they would receive no fee for their services. Ex. 5, ¶9. See *Sutton,* 504 F.3d at 693-94 (7th Cir. 2007) ("We recognized [in an earlier case] that there is generally some degree of risk that attorneys will receive no fee (or at least not the fee that reflects their efforts) when representing a class because their fee is linked to the success of the suit."). Here, Class Counsel faced risk in establishing that class treatment was appropriate and proving class liability. Defendants would likely have asserted additional defenses and the litigation would have been protracted and expensive. In particular, issues surrounding Covid-19 are largely unchartered waters within in the law. Given these risks, Class Counsel "could have lost everything" they invested. *Matter of Cont'l Ill. Sec. Litig*., 962 F.2d 566, 570 (7th Cir. 1992)

(Posner, J.).

Class Counsel's fee request should be approved because it is reasonably based on the market rate. No further showing or analysis is needed. *In re FedEx Ground Package Sys., Inc. Employment Practices Litig.,* 251 F. Supp. 3d at 1243 ("A lodestar cross-check … isn't encouraged in this circuit."); *Wright v. Nationstar Mortgage LLC,* No. 14 C 10457, 2016 WL 4505169, at *17 (N.D. Ill. Aug. 29, 2016) (courts can skip a lodestar check); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 n.27 (N.D. Ill. 2011) ("use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive"). This is because the recovery for Collective and Class Members is substantial, the entire Net Settlement Amount was available to Collective and Class Members, 60% of the Net Settlement Fund was guaranteed to be paid, Illinois Class Members did not have to submit any sort of claim form, and the settlement does not present indicia that it was the product of collusion between the Parties at the expense of Class Members. *See Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629, 636 (7th Cir. 2011) ("consideration of a lodestar check is not an issue of required methodology"); *In re Dairy Farmers of Am.,* 80 F. Supp. 3d 838, 850 (N.D. Ill. 2015) ("For attorneys who are arguing for a percentage-of-the-fund fee award, any delineation of hours is seemingly unnecessary . . . ."). Although courts occasionally review counsel's lodestar as "a cross-check to assist in determining the reasonableness of the fee award," *Heekin v. Anthem*, Inc., No. 05 Civ. 1908, 2012 WL 5878032, at *2 (S.D. Ind. Nov. 20, 2012), the lodestar crosscheck is of limited utility because "[u]ltimately . . . the market controls," *In re Trans Union Corp. Privacy Litig*., No. 00 Civ. 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009); *Wright*, 2016 WL 4505169, at *17 ("Nor the is the lodestar an accurate representation of the hypothetical market agreement between the plaintiffs and their attorneys"). As explained above, because Class Counsel's substantial work to date has "bought" a significant recovery for

Collective and Class Members, the Court need not analyze Class Counsel's lodestar.

The benefit the Settlement provides Collective and Class Members is excellent: Members are receiving more 100% of their unpaid overtime, FLSA Collective Members are receiving an additional allocation of over one million dollars, and, additionally a floor is set, so many will receive more than their actual unpaid overtime. Nor will Collective and Class Members be required to provide a general release to participate in the Settlement—the release is limited to wage claims, and only Illinois wage claims for those Members that only belong to the Illinois Class. The absence of a general release exemplifies the results achieved for Collective and Class Members. *See Ramah Navajo Chapter v. Babbitt,* 50 F. Supp. 2d 1091, 1103-04 (D.N.M. 1999) (noting the limited, rather than general, release as further evidence of an exceptional result in favor of class members). Thus, based upon the negotiated fee agreement in this case, the normal rate of compensation in similar cases, the risk Class Counsel undertook in engaging in this litigation, and the excellent result achieved for Members, Class Counsel is entitled to reasonable attorney's fees of one third of the fund and reimbursement of costs

## B.     The Incentive Award and Costs Are Appropriate and Should Be Approved.

Plaintiffs request $7,500, each, as incentive awards for Mr. Canas and Ms. Meschino's participation in this case—they both were instrumental to this case and it is because of their bravery thousands of employees will get substantial payments. They aided Class counsel in investigating these claims and also participated in the lengthy settlement conference that ended with the settlement of this matter. These awards are even more appropriate in this circumstance, when they are miniscule in relation to the Gross Settlement Fund: each incentive award is only .00096% of the Gross Settlement Fund. Thus, the awards will not reduce or affect any class member's settlement payments in any meaningful way. In employment-related class action, incentive awards

21

are particularly appropriate because it is common for prospective employers to do background checks on employees that reveal that they sued a past employer. In fact, if you type "Vanessa Meschino" into Google, the first result is an article and link to a PDF of our preliminary approval motion. While perhaps retaliation is or should be illegal, it's hard to prove and many employers will think twice about hiring a low-wage worker who cost a prior employer $7.75 million dollars because they stood up for the rights of tens of thousands of co-workers. There is no shortage of people earning $25 per hour in Illinois and its easier to move on to the next candidate than to hire someone who will stand up for their rights.

Courts in the Northern District of Illinois routinely award even larger service payments to named plaintiffs who perform similar actions to recover settlement funds on behalf of similarly situated employees in collective actions. *Furman*, 2017 WL 1730995, at *3 (approving $10,000 service award to named plaintiff in overtime collective action); *Briggs*, 2016 WL 7018566, at *2 (approving $12,500 service awards to named plaintiff in overtime collective action); *Castillo*, 2016 WL 7451626, at *2 (approving $10,000 service awards to named plaintiff in overtime collective action); *Koszyk*, 2016 WL 5109196, at *2 (same).

Plaintiffs' counsel incurred $2,202.55 related to this case (Ex.5 ¶10) but agreed to cap their costs at $2,000 in the Settlement Agreement so that is what is requested here.

## C.     The Claims Administrator Fees Should Be Approved.

The Settlement Agreement provides that the Claims Administrator be paid from the Gross Settlement Fund. These fees were estimated to be $120,800 and the Claims Administrator has not increased this estimate. Ex. 1, ¶16. The Claims Administrator has performed all necessary tasks, including mailing notices, creating a website, checking addresses and skip-tracing, collecting claim forms, maintaining records, calculating taxes and award distribution, and responding to

Plaintiffs' and Defendants' counsels inquiries. Ex. 1, ¶4-15. The Court should approve $120,800 be paid to the Claims Administrator from the General Settlement Fund pursuant to the estimate and Agreement.

## VI.  <u>CONCLUSION</u>

The parties' Settlement Agreement should be approved as it is fair, adequate, reasonable and the attorney fee and cost request, and Incentive Awards warrant approval. Therefore, Plaintiffs request that the proposed Final Approval Order (Exhibit 3 which will also be submitted through the Court's email system) be entered.


Dated: August 23, 2021                                  Respectfully Submitted,

                                                        By: /s/ John Kunze
                                                        One of Plaintiff's Attorneys

David J. Fish
John Kunze
Fish Potter Bolaños, P.C.
200 E 5th Ave, Suite 123
Naperville, IL 60563